# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:20-CV-291-DCK

| | | |
|---|---|---|
| **PHILIP STULL, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | <u>**ORDER**</u> |
| | ) | |
| **LIFE INSURANCE COMPANY OF** | ) | |
| **NORTH AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Life Insurance Company Of North America's Motion For Summary Judgment" (Document No. 16) and "Plaintiff's Motion For Summary Judgment" (Document No. 18), both filed April 12, 2021. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition. Having carefully considered the motion, the record, applicable authority, and oral argument at the motions hearing held on October 5, 2021, the undersigned will <u>grant</u> Plaintiff's motion for summary judgment and <u>deny</u> Defendant's motion for summary judgment.

## I.      BACKGROUND

Plaintiff Philip Stull III ("Plaintiff" or "Stull") filed a Complaint against Life Insurance Company of North America ("LINA" or "Defendant") and the Cross Company Long Term Disability Plan on May 22, 2020. (Document No. 1). On July 10, 2020, Plaintiff filed a notice of "Voluntary Dismissal Without Prejudice of Cross Company Long-Term Disability Plan" (Document No. 8), after which Cross Company Long Term Disability Plan was terminated as a Defendant – leaving LINA as the sole remaining Defendant.

Plaintiff brings two claims against Defendant: the first for wrongful denial of benefits under the Employee Retirement Income Security Act ("ERISA") at 29 U.S.C. § 1132(a)(1)(B), and the second for attorneys' fees and costs under ERISA at 29 U.S.C. § 1132(g). (Document No. 1, p. 4); (Document No. 20, p. 24). Plaintiff's claims arise out of his employment with Cross Technologies, Inc., which Plaintiff alleges was the Plan Administrator and sponsor of the ERISA-governed employee welfare benefit plan ("the Plan") of which he was a beneficiary. LINA, Plaintiff alleges, administered the Plan and had "authority to grant or deny benefits." (Document No. 1, pp. 1-2).

Plaintiff alleges that he worked for Cross Technologies, Inc. as a Regional Manager until June 2015, at which time his "impairments became so severe that he could no longer work and he was forced to leave his employment." Id. at p. 3. His role as Regional Manager "requires extensive travel by automobile," as "[d]riving is required 60-100% of the time and is a major function of the job." (AR 001505). Plaintiff's alleged impairments included "an essential tremor in his head and hands, chronic back pain, and other ailments, which prevent[ed] him from performing the material duties of his regular occupation." (Document No. 1, p. 3). According to Plaintiff, he also has cervical dystonia, which causes "an involuntary contraction of the neck muscles, causing the patient's head to become locked in a tilted or sideways position." (Document No. 18-1, p. 3). Moreover, Plaintiff's essential tremor is "a condition that causes an involuntary shaking of the head and hands" in a "no-no" manner – for which Plaintiff alleges there is no cure, although "medications can help lessen symptoms." Id.; see (AR 000590-91).

On account of his impairments, "Plaintiff applied to Defendant LINA and the Plan for [long-term disability] benefits and submitted medical information showing that he is totally disabled." (Document No. 1, p. 3). Under the Plan, an employee is eligible for disability benefits

2

where he or she becomes "[d]isabled," as defined by the Plan documents.  See (AR 003059).  An employee is "[d]isabled," and therefore entitled to disability benefits under the Plan, where, "solely because of Injury or Sickness, he or she" becomes "unable to perform the material duties of his or her Regular Occupation." Id.  "Regular Occupation" is defined under the Plan as "[t]he occupation the Employee routinely performs at the time the Disability begins," which is considered in terms of "the duties of the occupation as it is normally performed in the general labor market in the national economy" as opposed to "tasks that are performed for a specific employer or at a specific location." (AR 003074).  Furthermore, an employee must provide "continued proof of [] Disability for benefits to continue." (AR 003098).

Initially, LINA paid short-term disability benefits to Plaintiff "from June 20, 2015 through December 16, 2015." (Document No. 18-1, p. 6).  However, on Plaintiff's application for long-term disability ("LTD") benefits, LINA denied Plaintiff's claim on January 14, 2016.  Id.  Plaintiff appealed that denial, and LINA eventually overturned its initial denial of Plaintiff's application for LTD benefits on October 8, 2016.  Id. at p. 15.  This reversal of LINA's initial denial flowed from two physicians' opinions that Plaintiff "was restricted from driving due to the use of a fast acting opioid prescription." (Document No. 17, p. 4).  Those physicians included Dr. Weiran Wu, a board-certified psychiatrist, who opined that "due to medications, [Stull] could not safely operate a vehicle especially at the required levels of 60% to 100% of the day as an essential job function," and Dr. Gregory L. Smith, a board-certified physician in occupational medicine, who opined that Stull should not be "operating vehicles…within two hours of taking fast acting Opioids." (AR 002377-80).  Defendant contends that it paid those LTD benefits "from December 19, 2015 to May 26, 2017." (Document No. 17, p. 2).

3

Despite paying Plaintiff LTD benefits for about a year and a half, Plaintiff alleges that LINA then denied him benefits from May 26, 2017 onward. (Document No. 1, p. 3). The May 2017 denial resulted from LINA's review of additional medical information, which showed that "Plaintiff began new treatments and changed his prescriptions," providing grounds for LINA's conclusion that "Plaintiff was no longer disabled" after May 26, 2017. (Document No. 17, pp. 15-16). Specifically, LINA notes that he began "Botox injections for his tremor" in 2017, administered by his new neurologist, Dr. Danielle Englert. Id. at p. 4. Defendant contends that with the Botox injections, Stull "reported good improvement with no side effects." Id. The Administrative Record confirms the start of Botox injections; however, it does not indicate that the injections completely solved Plaintiff's cervical dystonia. See (AR 002164). Dr. Englert writes that although the Botox injections have resulted in "good improvement," and there are "no side effects" *from the injections*, he still "has dystonic head tremor with cervical dystonia causing his head to turn to the left and tilt to the right." Id.

LINA then contends that Stull also was counseled to find an alternative for his past hydrocodone use, and that the same physician who recommended the hydrocodone switch – Dr. Barron (a family practitioner) – recommended that he stop his Valium prescription as well. (Document No. 17, p. 4); see (AR 002249-51). Another alleged basis for LINA's denial of benefits from May 2017 on is LINA's contention that Plaintiff's physicians "were not imposing any work restrictions." (Document No. 17, pp. 4-5). In contrast, though, to Defendant's contention that his treating physicians were not imposing work restrictions, the Administrative Record tells a different story. Notably, Dr. Barron did not respond to LINA's inquiry about whether he would impose work restrictions– and although Dr. Englert did not herself impose restrictions, she "defers to other treating providers." (AR 000069). The Administrative Record similarly contradicts

4

Defendant's contentions that Plaintiff had shifted "away from using narcotics/opioids." (Document No. 17, p. 13). LINA's February 2018 letter denying Plaintiff's administrative appeal references a "September 26, 2017 office visit note from Dr. V[u]jicic." (AR000276). Evidently, then, LINA reviewed this visit note in arriving at its 2018 benefits denial determination. In this medical record – which is part of the Administrative Record in this case – Dr. Vujicic indicates that Plaintiff is currently taking "Acetaminophen-Oxycodone Hydrochloride." (AR001961). Clearly, then, Plaintiff had not stopped taking opioid medications – and Defendant's rationale for denying disability benefits on that basis is thus without merit.

Defendant also factored into its decision denying Plaintiff LTD benefits the opinion of Dr. Donald Minteer, who notably indicated that Stull was mildly "functionally limited…for activities requiring accurate head turning." (AR 002240). Again, the Court highlights that according to Stull's job description, "[d]riving is required 60-100% of the time and is a major function of the job" of "Regional Manager." (AR 001505).

Plaintiff contends that he then requested "administrative review of Defendant LINA's May 26, 2017 denial of benefits," and his appeal was denied. (Document No. 1, p. 3). Following that appeal, Plaintiff filed the instant lawsuit in this Court. Id. The basis for LINA's denial of his appeal was based on various physicians' reviews of Stull's medical file – importantly, they did not conduct actual physical examinations of Stull themselves. (Document No. 18-1, p. 23).[1] Dr. David

---

[1] The Court makes note of the fact that Defendant further relied upon the opinion of Dr. Elbert Greer Richardson, a board-certified psychiatrist, who opined that "Plaintiff's generalized anxiety disorder…did not support any work restrictions." (Document No. 17, p. 7). The undersigned is persuaded by Plaintiff's argument that since he "has not claimed that he is disabled on account of a mental health issue," Dr. Richardson's "report…appears irrelevant." (Document No. 20, p. 9, n.5). Plaintiff is claiming that he is disabled and thus entitled to LTD benefits because "of an essential tremor of his head and neck, cervical dystonia, chronic back pain, and the adverse side effects of medications he takes for these conditions." (Document No. 18-1, p. 1). Therefore, the undersigned will not recount the details of Dr. Richardson's review of Plaintiff's medical file here.

5

Burke, a neurologist, found that "[f]unctional limitations are not supported." (AR 001786). He wrote that "[t]he treating provider's opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques...there is no demonstration of measurable physical or cognitive defects affecting his ability to perform in a work environment." (AR 001784). Still, he says that despite "normal" neurological exams "[s]ince February 2017," Dr. Burke does note that Stull continues to have a "side-to-side tremor of his head and a mild tremor with his hands outstretched." (AR 001785).

Finally, to substantiate its decision to deny Plaintiff's appeal of LINA's denial of LTD benefits, LINA relied upon the opinion of Dr. Roger Belcourt, a board-certified physician in occupational medicine. (Document No. 17, p. 8). Dr. Belcourt indicated that Stull was "not functionally limited," particularly because there are "[n]o prior or current imaging studies [] available for review that would demonstrate severe degenerative changes of the lumbar spine." (AR 001781).

On April 12, 2021, both Plaintiff and Defendant filed the pending cross-motions for summary judgment, including "Life Insurance Company of North America's Motion For Summary Judgment" (Document No. 16) and "Plaintiff's Motion For Summary Judgment" (Document No. 18). Also on April 12, 2021, Defendant filed a "Brief In Support Of Motion For Summary Judgment" (Document No. 17), and Plaintiff filed a similar "Brief In Support Of Motion For Summary Judgment" (Document No. 18-1). On April 26, 2021, LINA filed "Defendant's Response In Opposition To Plaintiff's Motion For Summary Judgment" (Document No. 19), and Plaintiff filed his "Response Brief In Opposition To Defendant's Motion For Summary Judgment" (Document No. 20). On May 3, 2021, Defendant filed its "Reply In Support Of Defendant's Motion For Summary Judgment" (Document No. 21), and Plaintiff filed his "Reply Brief In

6

Support Of Plaintiff's Motion For Summary Judgment" (Document No. 22). The undersigned held a hearing on the cross-motions for summary judgment on October 5, 2021, at which counsel for the parties presented oral argument in support of their respective cross-motions for summary judgment. The pending motions are now ripe for review and disposition.

## II.     STANDARD OF REVIEW

The standard of review here is familiar. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F. Supp. 2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed,

7

and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. <u>Id.</u>

When considering cross-motions for summary judgment, a court evaluates each motion separately on its own merits using the standard set forth above. <u>See</u> <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 522 (4th Cir. 2003); <u>accord</u> <u>Local 2-1971 of Pace Int'l Union v. Cooper</u>, 364 F. Supp. 2d 546, 554 (W.D.N.C. 2005). Both Plaintiff and Defendant have moved for summary judgment, and the Court will analyze each motion in turn.

Moreover, "ERISA benefit actions are usually adjudicated on summary judgment rather than at trial." <u>Skinder v. Fed. Express Long Term Disability Plan</u>, 2021 WL 1377982, at *1 (W.D.N.C. Apr. 12, 2021) (citing <u>Vincent v. Lucent Techs., Inc.</u>, 733 F. Supp. 2d 729, 733-34 (W.D.N.C. 2010)); <u>see also</u> <u>Leahy v. Raytheon Co.</u>, 215 F.3d 11, 17-18 (1st Cir. 2002) ("In an ERISA benefit denial case, trial is usually not an option…[the district court in ERISA benefits denial cases] does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary").

"The scope of judicial review in an action challenging an administrator's coverage determination under section 1132(a)(1)(B) turns on whether the benefit plan vests the administrator with discretionary authority." <u>Skinder</u>, 2021 WL 1377982, at *6 (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)). According to the Supreme Court's decision in <u>Firestone</u>, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115. If the plan documents *do* grant the administrator or fiduciary the requisite discretion, "the courts' review is for abuse of discretion" rather than *de novo* review. <u>Woods v. Prudential Ins. Co.</u>

8

of Am., 528 F.3d 320, 322 (4th Cir. 2008).  The abuse of discretion standard of review applies only when "the plan manifest[s] a clear intent to confer such discretion." Id.  If there is any ambiguity as to whether the plan documents grant discretion, the ambiguity "is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured." Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 269 (4th Cir. 2002) (quoting Bynum v. Cigna Healthcare, Inc., 287 F.3d 305, 313-14 (4th Cir. 2002)).

### 1. *De Novo* Standard Of Review

Under the *de novo* standard of review, a district court must "make [its] own independent determination of whether [Plaintiff] was entitled to [] benefits" under the ERISA plan. Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013).  Such a standard concerns "[t]he correctness, not the reasonableness, of [the Defendant's] denial of [] benefits." Id.  This standard of review does not limit a court "to considering only the reasonableness of the decision and reasoning of the claims administrator;"  rather, a court considers "the meaning of the Plan terms in the first instance" and conducts its own review to determine the correctness of the claims administrator's decision.  Id. at 824.

### 2. Abuse Of Discretion Standard Of Review

"Under the abuse of discretion standard, this Court will uphold the decision of a plan administrator if the decision is reasonable, even if this Court would have reached a contrary conclusion upon an independent review." Skinder, 2021 WL 1377982, at *6.  The abuse of discretion standard of review counsels that "this Court should affirm a discretionary decision of a plan administrator if it is the result of a 'deliberate, principled reasoning process' and is supported by 'substantial evidence.'" Helton v. AT&T Inc., 709 F.3d 343, 351 (4th Cir. 2013) (quoting Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629 (4th Cir. 2010)).  Substantial evidence "is

9

more than a scintilla, but less than a preponderance." <u>Hensley v. Int'l Business Machines Corp.</u>, 123 F. App'x 534, 537 (4th Cir. 2004).

The Fourth Circuit has promulgated eight factors to help district courts in their analysis of whether a denial of benefits was reasonable. <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000). These non-exclusive factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

<u>Id.</u> at 342-43. However, "[a]ll eight <u>Booth</u> factors need not be, and may not be, relevant in a given case." <u>Skinder</u>, 2021 WL 1377982, at *7 (citing <u>Helton</u>, 709 F.3d at 357).

Importantly, "when an administrator or fiduciary with discretion is operating under a conflict of interest such that its decision to award or deny benefits impacts its own financial interests, 'that conflict must be weighed…in determining whether there is an abuse of discretion.'" <u>Bernstein v. CapitalCare, Inc.</u>, 70 F.3d 783, 787 (4th Cir. 1995) (quoting <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 115). This conflict of interest factor, however, is "one factor among many" in the evaluation of abuse of discretion. <u>Champion v. Black & Decker (U.S.) Inc.</u>, 550 F.3d 353, 358 (4th Cir. 2008).

## III.    DISCUSSION

In its "Brief In Support Of Motion For Summary Judgment" (Document No. 17), LINA contends that "[t]he Administrative Record establishes that LINA's claim decisions were correct

because Plaintiff's alleged conditions" – including "head and hand tremors, anxiety, cervical dystonia, lumbar spondylosis with low back pain, gout, and deep vein thrombosis of the lower extremity" – "no longer restricted his ability to perform his light duty occupation." (Document No. 17, p. 2). Plaintiff, on the other hand, contends in its "Brief In Support Of Motion For Summary Judgment" (Document No. 18-1) that he "is entitled to benefits under the Plan because Plaintiff submitted uncontroverted proof that he is unable to perform the material duties of his own regular occupation of Account Manager/Regional Manager because of [his various medical conditions] and the adverse side effects of medications he takes for these conditions." (Document No. 18-1, p. 1).

### 1. Standard Of Review

Plaintiff and Defendant disagree on the appropriate standard of review to apply in evaluating the cross-motions for summary judgment. Plaintiff contends that the *de novo* standard of review applies "[b]ecause there is no grant of discretion to Defendant in the Group Policy." Id. at p. 11. And, Plaintiff argues, this is because "[a]bsent a clear grant of discretionary authority in the benefit plan, *de novo* review requires this Court to make its own independent determination of whether a plaintiff is entitled to continued long-term disability benefits." Id. at p. 9. Plaintiff contends that it asked the Plan Administrator – Cross Company – for a copy of the Plan documents. Id. at pp. 9-10. Upon receipt of the Policy, Plaintiff noticed that an "integration clause" indicates that the "Group Policy" is "the entire contract," and therefore, no documents outside of the Policy can be considered a Plan document. Id. at p. 10; see (AR 003071).

Plaintiff therefore argues that the Appointment of Claim Fiduciary ("ACF") form that Defendant produced during the instant litigation is "insufficient to confer discretionary authority" on LINA because "it is not referenced or incorporated into the integrated Group Policy, and it was

11

not endorsed on or attached to the Group Policy as a valid amendment." (Document No. 18-1, p. 12). Moreover, Plaintiff contends, the fact that "neither Cross Company nor Defendant" at any point "ever produced the ACF during the entire administrative process – despite five separate requests for plan documents…is evidence that…the ACF was [not] part of the Policy." (Document No. 22, pp. 2-3).

Defendant, on the other hand, contends that the abuse of discretion standard of review applies. LINA argues that "[w]hen, as here, the Plan grants the fiduciary discretionary authority to interpret the terms of the Plan, the court limits its review on the motion for summary judgment to the issue of whether the fiduciary abused its discretion in denying the claim." (Document No. 17, p. 9). Under this standard, Defendant argues, "[t]he burden of proof rests with Plaintiff as to both proving his entitlement to Plan benefits and proving that LINA abused its discretion." Id.

In support of its argument that the Plan documents confer upon LINA the requisite discretion for the abuse of discretion standard of review to apply, LINA points to the ACF form and the Summary Plan Descriptions ("SPD"). (Document No. 19, pp. 5-6). According to the ACF, LINA as the "Claim Fiduciary" has "the authority, in its discretion, to interpret the terms of the Plan, including the Policies; [and] to decide questions of eligibility for coverage or benefits under the Plan." (AR 003049). The SPD contains the same language. See (AR 003110).

The ACF document, Defendant argues, is a Plan document. Defendant contends that in addition to the language conferring the necessary discretion to interpret the Plan, the ACF form "was signed by the insurer and the Plan representative (who was authorized to amend the Plan)." (Document No. 19, p. 6). Moreover, the effective date of the ACF is "the same as the policy effective date," and it was executed "before the effective date of the Policy," suggesting that it was meant to form part of the Plan documents. Id.

12

The Court is persuaded by Defendant's arguments on the standard of review issue and will analyze the wrongful denial of benefits claim under the abuse of discretion standard of review. The Court will apply an abuse of discretion standard of review where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115. Where the terms of the plan do not grant the administrator or fiduciary such discretion, district courts are to apply the *de novo* standard of review. Id. Here, as analyzed below, the requisite grant of discretion to LINA is present, thus warranting application of the abuse of discretion standard of review.

The Supreme Court has stated that an ERISA plan refers to "a scheme decided upon *in advance*…that define[s] the rights of a beneficiary and provide[s] for their enforcement." Pegram v. Herdrich, 530 U.S. 211, 223 (2000) (emphasis added). Defendant's citation to the Moore v. Life Insurance Company of North America case from the Western District of Virginia is particularly instructive, given that it considered identical language in a document as that at issue here. In that case, the district court considered the issue of whether an Appointment of Claim Fiduciary ("ACF") form was part of the ERISA Plan – an issue that would affect whether the *de novo* or the abuse of discretion standard of review applied, just as it does in the instant case. 2018 WL 1461502, at *2 (W.D. Va. Mar. 23, 2018). The district court cited to multiple cases from various appellate courts, all of which indicate that "often multiple documents [can] together represent the whole of the plan." Id. (collecting cases).

Under the ACF in this case (and in Moore), LINA is "the designated fiduciary for the review of claims for benefits…[and] shall be responsible for adjudicating claims for benefits under the Plan, and for deciding any appeals of adverse claim determinations." (AR003049). LINA "shall have the authority, in its discretion, to interpret the terms of the Plan, including the Policies;

13

to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." Id.; see 2018 WL 1461502, at *1. Defendant points out "that [the ACF] was executed on February[] 18, 2013, before the effective date of the Policy." (Document No. 19, p. 6). Moreover, the effective date of the ACF is the same as the effective date of the Policy. (AR003049); (AR003054). The undersigned is thus persuaded that these two facts taken together "support[] the fact that the ACF was a part of the Plan documents, as it shows that it was a part of the scheme or set of rules 'decided upon in advance.'" (Document No. 19, pp. 6-7) (citing Pegram, 530 U.S. at 223).

Moreover, Plaintiff relies heavily on the integration clause in the Group Policy document to support its argument that the ACF cannot be a Plan document. (Document No. 18-1, p. 10); see (AR003071). The integration clause states that the "entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds." (AR003071). The contract to which the clause refers is presumably the Group Policy itself. Certainly, the integration clause thus suggests that the entire *Policy* is comprised of the enumerated documents. However, there is an important "distinction between an insurance policy (which is but one component of the Plan) and the Plan itself (which is comprised of several documents, among them an insurance policy and the ACF)." Moore, 2018 WL 1461502, at *3, n.3; see Pettaway v. Teachers Ins. and Annuity Ass'n of Am., 644 F.3d 427, 434 (D.C. Cir. 2011) (ERISA's "statutory text clearly contemplates multiple relevant documents" and does not "suggest[] that one plan document must contain all the legally relevant terms and language"). Thus, the Plaintiff's argument that stands heavily upon the integration clause is misguided – the integration clause does not suggest that the *Plan* is comprised only of the enumerated documents, only that the *Policy* is so limited. The ACF therefore is a Plan document, and as such, provides

14

LINA with the requisite discretion to determine benefits eligibility and to construe the terms of the Plan. The abuse of discretion standard of review will therefore guide the Court's analysis in the following sections.

### 2. Parties' Arguments In Support Of Their Respective Summary Judgment Motions

LINA contends that summary judgment should be granted in its favor because its "claims decision [was] the product of a principled, reasoned decision-making process that [was] supported by substantial evidence." (Document No. 17, p. 11) (citing <u>Booth</u>, 201 F.3d at 341-43). In support of its contention, LINA argues that "[t]he Administrative Record contains substantial evidence that Plaintiff is not Disabled as defined by the Policy." (Document No. 17, p. 13). The substantial evidence that Defendant puts forth includes three assertions. First, Defendant contends that Stull had a prescription change "away from using narcotics/opioids and Valium" toward an emphasis upon "Botox injections…to treat [his] tremors." <u>Id.</u> With this medication change, Defendant asserts, "Plaintiff saw good improvement in his condition with no side effects." <u>Id.</u>[2] Furthermore, Defendant notes that "[i]n May 2017, Plaintiff's primary care physician and his neurologist declined to provide any work restrictions to LINA." <u>Id.</u> at pp. 13-14. Third and finally, LINA obtained the opinions of three independent physicians. <u>Id.</u> at p. 16. Because of the alleged medication change, the lack of work restrictions from Plaintiff's own doctors, and "the three independent medical reviewers[']" opinions, Defendant argues that "LINA's conclusions that Plaintiff was no longer Disabled is well-supported by the Administrative Record." <u>Id.</u> at p. 14.

---

[2] As stated in the Background section of this Order, the notion that Plaintiff stopped using opioids is contradicted by the Administrative Record. See (AR001961). Plaintiff continued to take opioids as of September 2017, and evidence of such was present in LINA's review before it issued its final denial in 2018.

15

Finally, LINA argues that despite "its dual-role as a claim reviewer and claim payor and the structural conflict of interest," it "has implemented the necessary safeguards to prevent any structural conflict of interest from actually impacting claim decisions." Id. at p. 17. For example, the decision-makers with respect to granting or denying claims "are paid salaries [that] are wholly unrelated to the amount of claims paid or denied." Id. Furthermore, the "business units" charged with making "benefit claims decisions" are "separate from LINA's financial advisors" and "located in a different city." Id. at p. 9. For each of these reasons, LINA contends that there is no genuine dispute of material fact that Plaintiff did not qualify for LTD benefits under the Plan and summary judgment should be granted in its favor.

Stull, on the other hand, argues that summary judgment should be granted in his favor because "no genuine issue of material fact exists that Plaintiff is disabled." (Document No. 18-1, p. 13). Plaintiff contends that his "doctors who have treated his essential tremors/cervical dystonia have uniformly found that [he] is disabled because he is unable to perform the material duties of his job as a result of that condition." Id. Plaintiff further notes that his "two former work supervisors…have both testified that based on their work with Plaintiff and their personal observations of him over a period of years, including the progression of his disabling conditions," his ability to perform his job is restricted. Id. at p. 14. Particularly noteworthy, Plaintiff asserts, is the fact that "Defendant previously determined that Plaintiff was disabled based on the findings of Dr. Smith, a Board-Certified Occupational Medicine physician, and Dr. Wu, a Board-Certified psychiatrist." Id. LINA's initial finding that Plaintiff *was* entitled to LTD benefits was based on the doctors' finding that "because Plaintiff had been prescribed and was using fast-acting opioids to relieve his back and neck pain, Plaintiff should not be driving on a consistent basis nor working

16

in an industrial setting." Id. at pp. 14-15. These "activities were material elements of his job." Id. at p. 15.

Plaintiff, in contrast to Defendant, contends that he *has* "continued his same prescription medications, including the use of fast-acting opioids to control his back and neck pain." Id. This statement directly contrasts with Defendant's contention that Stull changed his prescription medication – a primary basis for LINA's finding that he no longer qualified for LTD benefits under the Plan. See (Document No. 17, p. 15).

Plaintiff further attempts to undercut the reasonableness of Defendant's conclusion that he was not entitled to LTD benefits by arguing that the "paper-review opinions of Drs. Burke and Belcourt" that provided the basis for the benefits denial "are not credible opinions on which an ERISA fiduciary would rely in denying a benefits claim." (Document No. 18-1, p. 17). Plaintiff asserts a variety of reasons for the alleged unreliability of such opinions, the primary argument being that "[n]either Dr. Burke's nor Dr. Belcourt's medical opinion involved an [in-person] examination of Plaintiff; rather, all analyses were based solely on medical records." Id. at p. 23.

Plaintiff finally takes issue with LINA's contention that the structural conflict of interest should not push the Court to conclude that it was unreasonable in its denial of LTD benefits to Plaintiff. Plaintiff argues that "Defendant's consistent, unreasonable actions show its conflict as a major factor demonstrating abuse of discretion." (Document No. 20, p. 24).

### 3. Whether LINA Abused Its Discretion In Denying Plaintiff's Claim For Disability Benefits

The Court will use the eight-factor test announced by the Fourth Circuit in Booth to guide its analysis of whether LINA abused its discretion in denying Plaintiff's claim for disability benefits. Booth, 201 F.3d at 342-43. The abuse of discretion standard, the Fourth Circuit has

17

indicated, "equates to reasonableness…an administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). The Court, though, will not evaluate every Booth factor – as not every factor is relevant here. See Skinder, 2021 WL 1377982, at *7 ("[a]ll eight Booth factors need not be, and may not be, relevant in a given case") (citing Helton, 709 F.3d at 357). The factors that the Court will analyze here include: the first, third, fourth, fifth, sixth, and eighth factors.[3]

a. **Booth Factors (1) and (4) – The Language of the Plan and Consistency of LINA's Denial With Its Earlier Interpretation of the Plan**

Under the terms of the Plan at issue here, Stull would be eligible for disability benefits if, "solely because of Injury or Sickness, he" becomes "unable to perform the material duties of his [] Regular Occupation" and is "unable to earn 80% or more of his [] Indexed Earnings from working in his [] Regular Occupation." (AR003057); (AR003059). This definition of disability under the Plan applies whether or not Plaintiff is considered an Executive, given the time frame at issue in this case. See (AR003056).[4] "Regular Occupation" is defined in the Plan as "[t]he

---

[3] The Court will not address the second and seventh Booth factors because they are not relevant here. See 201 F.3d at 342-43. First, given that the language of the Plan here does not address any overarching "purposes and goals," the undersigned will not speculate as to whether LINA's determination to deny Plaintiff's claim for disability benefits was in accordance with this Booth factor. Id. at 342. Furthermore, with respect to the seventh factor – whether LINA's determination followed "any external standard relevant to the exercise of discretion" – the Court will similarly decline to analyze this factor. Id. There is no external standard of review that would apply to LINA's decision-making process in this matter. (Document No. 17, p. 12, n.1).

[4] The undersigned will not address whether or not Plaintiff is considered an Executive, as that classification impacts the Court's analysis only where it is evaluating determinations on eligibility for disability benefits after 36 months during which disability benefits are payable. See (AR003057); (AR003059). Although the undersigned will not attempt to categorize Plaintiff as an Executive or non-Executive, an explanation of why such analysis is not necessary here is warranted. If Plaintiff were to be classified as a *non-Executive*, in order to remain eligible for disability benefits, he would have to show that after 36 months (or three years) of being paid such benefits, he not only could not perform his Regular Occupation, but that he also "was "unable to perform the material duties of *any occupation* for which he [] is, or may reasonably become, qualified based on education, training or experience." (AR003059) (emphasis

18

occupation the Employee routinely performs at the time the Disability begins…[it is considered in terms of] the duties of the occupation as it is normally performed in the general labor market in the national economy," and as such, "[i]t is not work tasks that are performed for a specific employer or at a specific location." (AR003074). Furthermore, a claimant for disability benefits must provide "continued proof of [his or her] Disability for benefits to continue." (AR003098).

In contrast to Defendant's contentions, Plaintiff *has* furnished continued proof of his disability – nothing with respect to his disability has materially changed since LINA stopped granting him benefits in May 2017, and Defendant's suggestion otherwise is contrary to the language of the Plan. The undersigned thus concludes that LINA fails to satisfy the first <u>Booth</u> factor – its determination that Plaintiff was not disabled from May 2017 onward ran contrary to the Plan's language. 201 F.3d at 342. Furthermore, with respect to <u>Booth</u> factor four, LINA's determination to deny Plaintiff's administrative appeal of his disability claim runs contrary to its earlier interpretation of the Plan in 2016 when it granted him benefits. 201 F.3d at 342; <u>see</u> (Document No. 17, p. 4).

Plaintiff submitted evidence from his office visits with Dr. Englert, his treating neurologist who took over Plaintiff's neurological treatment for Dr. Ryder-Cook. (Document No. 18-1, p. 14). In the note from his office visit closest in time to Defendant's denial of Stull's administrative appeal of his disability claim, Dr. Englert notes that "the patient has cervical dystonic posturing

---

added). However, if Plaintiff were to be classified as an *Executive*, he would not have to make this extra showing – he would remain eligible for benefits even past the three-year mark simply upon continued proof of his inability to perform his own Regular Occupation. (AR003057). Here, Plaintiff was paid disability benefits beginning on December 19, 2015. (Document No. 17, p. 2). The Court's review of LINA's actions centers upon LINA's final denial of Plaintiff's administrative appeal of his claim for disability benefits – which LINA memorialized by letter dated February 19, 2018. (AR00272). The Court would only need to adjudicate whether Plaintiff was considered an Executive under the Plan if its review concerned a final denial by LINA made on or after approximately December 19, 2018 – 36 months after December 19, 2015. That is not the case here, and thus, Defendant is correct that such issue is not before the Court. (Document No. 19, p. 11, n.3).

with his head turning to the left and tilting to the right," which was evident during a "movement disorder exam" that she performed with him in January 2018. (AR001793-94). Dr. Burke's independent medical review – notably without an in-person examination of Stull – specifically notes Dr. Englert's office visit with Stull in January 2018, on which occasion Stull's head presented with "a dystonic 'no-no' head tremor." (AR001785). Dr. Burke then went on to conclude, however – seemingly disregarding Dr. Englert's observations entirely – that Stull was "not functionally limited" because "mild head and hand tremors do not translate into significant physical limitations/inability to work or function." (AR001786). This conclusion upon which LINA relied is without support – where Plaintiff's neurologist concluded that he continued to have a tremor and an involuntary tilting of his head, Dr. Burke cannot plausibly state without more that Plaintiff was able to drive and thus was not disabled within the meaning of the Plan.

Furthermore, Plaintiff submitted evidence from an appointment with Dr. Vujicic at a pain clinic in which the visit note indicates that Plaintiff continued to take acetaminophen-oxycodone hydrochloride (an opioid) as of September 2017. (AR001961). This is in direct contrast to Defendant's statement that Plaintiff had stopped taking opioids. (Document No. 21, p. 21). In 2016, when LINA overturned its initial denial of Plaintiff's claim for long-term disability benefits and granted him such benefits, it based its decision on the opinions of two physicians who concluded that Plaintiff's "use of a fast acting opioid prescription" imposed restrictions on his ability to drive, and thus, he was entitled to disability benefits. (Document No. 17, p. 4). Nothing has changed since that review, as shown by the medical evidence in the Administrative Record that Plaintiff submitted as part of his obligation to provide continuing proof of disability.

Under both Booth factors one and four – the language of the Plan and the consistency of LINA's determination to deny Plaintiff disability benefits with its earlier decision to award him

20

such benefits – LINA's decision fails to satisfy such criteria for aiding the Court's evaluation of whether LINA acted reasonably. 201 F.3d at 342. At the time that Plaintiff stopped working for Cross Company in June 2015, he was employed as a "Regional Manager." (Document No. 17, p. 3). According to a statement that is part of the Administrative Record submitted by Cross Company, "[t]he Regional Manager position requires extensive travel by automobile [and] [d]riving is required 60-100% of the time and is a major function of the job." (AR001505). The Regional Manager position was thus Stull's "Regular Occupation" within the meaning of the Plan. And, to be consistent with its previous interpretation of the Plan – under which LINA provided Stull with long-term disability benefits *because he could not drive* – it follows that LINA previously interpreted his inability to drive as qualifying him for long-term disability benefits because he could not perform his Regular Occupation. To be consistent with such an interpretation – where nothing about his ability to drive has changed – LINA should have found that he continued to qualify for long-term disability benefits. Its finding to the contrary was an abuse of discretion under <u>Booth</u> factors one and four as discussed above.

Thus, given the medical evidence that Plaintiff provided showing his continued use of opioid prescription medications and his physical disabilities that prevented him from driving safely – his head turning from side to side and sometimes becoming locked in a certain tilted position – it was unreasonable for LINA to deny Plaintiff disability benefits. Both the language of the Plan that pointed toward the opposite result and Defendant's previous interpretation warrant the conclusion that Defendant abused its discretion on an analysis of <u>Booth</u> factors one and four.

> **b. <u>Booth</u> Factors (3) and (5) – The Adequacy of the Materials Considered and the Degree to Which They Support The Benefits Denial and Whether LINA's Decision-making Process Was Reasoned and Principled**

Under the third <u>Booth</u> factor, the Court must evaluate whether LINA considered adequate materials in reaching its decision and whether the materials considered support the decision to deny Plaintiff long-term disability benefits. 201 F.3d at 342. This factor is similar to the inquiry that the Court must conduct on the fifth <u>Booth</u> factor – "whether the decisionmaking process was reasoned and principled." <u>Id.</u> On both of these factors, for the reasons explained below, the undersigned finds that LINA abused its discretion because it did not consider sufficient materials and it did not employ a reasoned and principled decision-making process.

First, with respect to the adequacy of the materials considered, LINA leaned heavily on the opinion of Dr. Burke, who conducted a paper review of Stull's medical file. <u>See</u> (AR000274). Dr. Burke concluded that "there is no demonstration of measurable physical or cognitive deficits affecting his ability to perform in a work environment." (AR001784). Later though, Dr. Burke seems to acknowledge that, in fact, Plaintiff *does* present with physical impairments – a "side-to-side tremor of his head and a mild tremor with his hands outstretched." (AR001785). He concludes, however, that these physical issues "do not translate into significant physical limitations/inability to work or function." (AR001786).

Dr. Burke, who did not physically examine or observe Stull, cannot credibly conclude that side-to-side head tremors and shaking hands were not so severe that they did not affect Stull's ability to drive or do his job. In order for LINA's decisionmaking process to have been based upon adequate materials, then, it would have seemed prudent – *absent additional explanation* – for Dr. Burke to have either reached out to one of Stull's physicians to probe the gravity of his head and hand tremors or to physically examine Plaintiff himself. <u>See</u> <u>Whitley v. Hartford Life & Acc. Ins. Co.</u>, 262 F. App'x 546, 554 (4th Cir. 2008) ("Hartford has not presented any evidence with regard to how Dr. Turner, a physician who had never examined Whitley, could accurately

22

deduce how long Whitley could sit at a time or the amount of force with which he could push or pull"). Of course, this is not to say that LINA was required to conduct a physical examination upon Stull in its review process. See Griffin v. Hartford Life & Acc. Ins. Co., 898 F.3d 371, 383 (4th Cir. 2018) ("[w]hile ERISA administrators may not deny benefits without an adequate evidentiary basis, they are 'under no duty to secure specific forms of evidence.'") (quoting Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999)). Still, "the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review." Haisley v. Sedgwick Claims Mgmt. Servs., Inc., 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011).

In this case, where Dr. Burke failed to explain *why* he did not believe that the hand and head tremors were physically limiting such that Plaintiff would not be considered disabled, LINA's reliance on his opinion was an abuse of discretion. Dr. Burke should have either contacted Plaintiff's physicians to gain greater understanding of the physical manifestations of his conditions or examined Plaintiff himself. See Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014) ("a plan administrator cannot be willfully blind to medical information that may confirm the beneficiary's theory of disability…[a] searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim").

Similarly, for the same reasons that reliance upon Dr. Burke's opinion was an abuse of discretion, LINA's reliance upon Dr. Belcourt's opinion is also flawed. Dr. Belcourt indicates that "[t]here are no documented functional limitations for which continuous medically necessary work restrictions would be reasonable or required," and Stull's "diagnosis of lumbar spondylosis" is not supported by "prior or current imaging studies." (AR001781). Dr. Belcourt, like Dr. Burke, did

23

not reach out to Dr. Vujicic, which "would have [] further confirmed Plaintiff's continued use of fast-acting opioids." (Document No. 20, p. 17); see (AR001962). That use of prescription opioid medication provided the basis for LINA's previous *granting* of disability benefits to Plaintiff because it affected his ability to drive. Furthermore, had Dr. Belcourt contacted Dr. Vujicic, he would have "understood that Plaintiff had an MRI that confirmed the source of his back pain, which was part of the basis for Dr. Vujicic's continued pain treatment." Id. As a result of these defects in the underlying sources used in LINA's decision-making process, its "failure to make more of an effort to get to the truth of the matter undermines Defendant's claim that it used a deliberate, principled reasoning process." Skinder, 2018 WL 1377982, at *12 (internal quotations and citations omitted). The Court thus finds that Booth factors three and five favor the Plaintiff and support a conclusion that LINA abused its discretion.

### c. Booth Factor (6) – Whether LINA's Decision Was Consistent With ERISA's Procedural and Substantive Requirements

With respect to Booth factor six, whether LINA's decision was consistent with ERISA's procedural and substantive requirements, the Court finds that this factor tips in favor of the Defendant. Plaintiff argues that "Defendant was required to have a Board-certified anesthesiologist/pain medicine doctor review Plaintiff's medical records." (Document No. 20, p. 18) (citing 29 C.F.R. § 2560.503-1(h)(3)(iii)). LINA did not violate ERISA's procedural requirements by having Dr. Belcourt, a physician in occupational medicine, review Plaintiff's medical records, which included the records of Dr. Vujicic involving Plaintiff's back pain. Although the Fourth Circuit has not squarely addressed this issue, many courts have concluded that an occupational medicine doctor can opine about various medical ailments. See Topalian v. Hartford Life Ins. Co., 945 F. Supp. 2d 294, 354 (E.D.N.Y. 2013) ("ERISA [does not] require a

24

plan administrator to rely only upon the opinions of specialists nor preclude a plan administrator from relying on the opinions of physicians trained in internal or occupational medicine") (collecting cases).

### d. <u>Booth</u> Factor (8) – LINA's Conflict of Interest

Finally, as to the last <u>Booth</u> factor – whether LINA has any conflict of interest that may affect the Court's conclusion on the abuse of discretion inquiry – the Court finds that this factor favors the Defendant. 201 F.3d at 343. The Supreme Court has stated that "a conflict of interest can support a finding that an administrator abused its discretion only where the evidence demonstrates that the conflict actually motivated or influenced the claims decision." <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 123 (2008). But, this factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." <u>Id.</u> at 117. LINA has acknowledged "its dual role as a claim reviewer and claim payor," however, it details the various steps it has taken to reduce the impact of this structural conflict of interest. Those steps include paying the claims administrators "salaries, which are wholly unrelated to the amount of claims paid or denied." (Document No. 17, p. 17). Further, "LINA does not establish numerical guidelines or quotas regarding claim payments or denials," and it does not evaluate employees "on the basis of the amount or number of claims paid or denied." <u>Id.</u> Plaintiff has stated nothing more than conclusory allegations about the impact of the structural conflict of interest on the decision to deny him benefits. Thus, this <u>Booth</u> factor favors Defendant. Nonetheless, as explained below, the Court will find that the other <u>Booth</u> factors still warrant a finding of abuse of discretion.

On balance, the Court concludes based on the analysis of the <u>Booth</u> factors that LINA abused its discretion in denying Plaintiff's claim for long-term disability benefits. Given that evidence in the Administrative Record demonstrates that Plaintiff's condition and medications had not materially changed since its earlier decision *granting* Plaintiff benefits, its decision to overturn that award and instead deny Stull long-term disability benefits ran contrary to its earlier interpretation of the language of the Plan. Moreover, in failing to contact Plaintiff's physicians to understand the physical manifestations of his conditions or to examine Plaintiff himself, the independent medical reviews that Defendant relied upon were deficient. LINA thus failed to employ a reasoned and principled decision-making process, and it failed to consider adequate material in reaching its conclusion. Despite the structural conflict of interest having no impact on the decision, and the lack of procedural violation of the ERISA statute, the Court still finds that LINA's decision was unreasonable and an abuse of discretion based upon the analysis on the other relevant <u>Booth</u> factors. The Court therefore will grant Plaintiff's motion for summary judgment and deny Defendant's motion for summary judgment as to Plaintiff's claim for wrongful denial of benefits under section 502(a)(1)(B).

### 4. Remedy

The Court must now evaluate whether to remand to LINA for further adjudication of Plaintiff's claim "or directly grant benefits." <u>Montero v. Bank of Am. Long-Term Disability Plan</u>, 2016 WL 7444957, at *6 (W.D.N.C. Dec. 27, 2016). "[R]emand [to the claim fiduciary for re-adjudication of the claim] is not [always] required, particularly in cases in which evidence shows that the administrator abused its discretion." <u>Helton</u>, 209 F.3d at 360. Moreover, "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." <u>Gorski v. ITT Long Term Disability Plan for Salaried Employees</u>, 314 F. App'x

26

540, 548 (4th Cir. 2008) (internal quotations and citations omitted). The Court therefore will direct that Defendant reinstate Plaintiff's long-term disability benefits and pay any past due benefits. As detailed in the Conclusion section of this Order, the Court will respectfully direct the parties to confer about the amount of such benefits due.

### 5.  Plaintiff's Claim For Attorneys' Fees Under ERISA Section 502(g)

The ERISA statute "provides for the discretionary award of attorneys' fees and costs of action to parties who have 'some degree of success on the merits.'" <u>Ramirez v. Liberty Life Assurance Co. of Boston</u>, 2019 WL 469930, at *13 (W.D.N.C. Feb. 6, 2019) (citing 29 U.S.C. § 1132(g)(1)). The following factors guide district courts in the Fourth Circuit in evaluating the appropriateness of an attorneys' fees award:

> (1) degree of opposing parties' culpability or bad faith;
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
> (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
> (5) the relative merits of the parties' positions.

<u>Williams</u>, 609 F.3d at 635 (quoting <u>Quesinberry v. Life Ins. Co. of N. Am.</u>, 987 F.2d 1017, 1029 (4th Cir. 2010)).

In this case, although it is evident that Plaintiff has achieved success on the merits on her wrongful denial of benefits claim, "[t]he parties do not provide much argument regarding the appropriateness of attorneys' fees and costs" in their briefs based on the above factors. <u>Ramirez</u>, 2019 WL 469930, at *13. Thus, as outlined below, the parties will be directed to confer regarding the appropriateness of an attorneys' fees award to the Plaintiff and only if such efforts to confer fail should they seek Court intervention.

27

# IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that "Life Insurance Company Of North America's Motion For Summary Judgment" (Document No. 16) is **DENIED**.

**IT IS FURTHER ORDERED** that "Plaintiff's Motion For Summary Judgment" (Document No. 18) is **GRANTED** as to Plaintiff's claim for wrongful denial of benefits under ERISA section 502(a)(1)(B).

**IT IS FURTHER ORDERED** that the parties confer regarding the appropriate relief in this case on or before **November 22, 2021**, including but not limited to the amount of long-term disability benefits owed to Plaintiff, any amount of attorney's fees that might be owed to the Plaintiff that the parties agree upon, and, if applicable, any pre-judgment or post-judgment interest. The parties are respectfully advised that if an agreement on these sums cannot be made without further Court intervention, Plaintiff's counsel may file a motion with appropriate supporting documentation outlining his respective position on the amount of relief due to him on or before **December 10, 2021**.

**SO ORDERED**.

Signed: October 27, 2021

David C. Keesler
United States Magistrate Judge

28